IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **COURTNEY L. MORGAN** | * | |
| | * | |
| v. | * | Civil No.  GJH 13-1394 |
| | * | |
| **CITY OF ROCKVILLE, et al.** | * | |
| | * | |

**MEMORANDUM OPINION**

Presently pending is Plaintiff's Memorandum Re: Attorney-Client Privilege, hereinafter referred to as Plaintiff's Motion to Compel Production of the Saul Ewing Report.  ECF No. 51.  The issues have been fully briefed and no hearing is necessary.  *See* Local Rule 105.6.  For the reasons set forth below, Plaintiff's motion will be denied.

**I. Background.**

This case arises out of a racial discrimination claim filed by Plaintiff against Susan Swift and the City of Rockville.  During discovery, Plaintiff sought the production of an investigative report conducted on behalf of the City by Saul Ewing, LLP.  ECF No. 40-1.  The City hired Saul Ewing as part of an effort to address recent complaints by city employees about the workplace environment.  On May 4, 2012, the City and Saul Ewing executed a written agreement setting out the terms of the project.  ECF No. 52-1.  Exhibit A to the agreement states that Saul Ewing will "[r]eview, revise, and supplement the City's Personnel Policy and Procedures Manual" and "[c]onduct investigations of . . . [c]omplaints by former City employees . . . [and] [w]orkplace complaints by current City employees."  *Id.*  The document also explains that Saul Ewing was required to submit a "Confidential Report summarizing [its] findings and offering recommendations to the City."  *Id.*  The hourly rates of the Saul Ewing lawyers assigned to the project also are included.

After the report was completed, the City of Rockville issued a news release stating that the City had engaged Saul Ewing to conduct an internal review of Rockville's personnel policies and procedures and that "Saul Ewing identified no unlawful conduct." ECF No. 52-2 at 1. The news release stated that the report contained several recommendations, including (1) refining the City's employee performance evaluation policies; (2) updating the City's Personnel Policies and Procedures Manual; and (3) improving training to ensure consistent application of the City's policies across the organization. *Id.*

Defendants refused to produce the report to Plaintiff, claiming that the document was protected by the attorney-client privilege. The court held a telephone conference on July 17, 2014 to address the issue and, after some discussion, directed the parties to brief the matter further. The issues presented in those briefs are the same issues presently pending before the court, namely: (1) whether the Saul Ewing report is protected by the attorney-client privilege and (2) if so, whether Defendants waived the privilege by disclosing the content of the report in a news release.

## II. Discussion.

### a. Attorney-Client Privilege.

The aim of the attorney-client privilege is "'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2320-21 (2011) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The objectives of the attorney-client privilege apply to governmental or corporate clients just as they do to individual clients. *Id.* "The privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture." *Id.* at 2321. "Unless

applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *Id.* (citation omitted). "Admittedly complications in the application of the privilege arise when the client is a corporation [or a government entity], which in theory is an artificial creature of the law, and not an individual; but this Court has assumed that the privilege applies when the client is a corporation." *Upjohn Co.*, 449 U.S. at 389-90.

> A party asserting the attorney-client privilege must demonstrate that:
>
> (1) the asserted holder of the privilege is or sought to become a client;
>
> (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;
>
> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997). Here, there is no dispute that Saul Ewing LLP entered into a written agreement with the mayor and the city council of Rockville to provide "professional and specialized legal services" and to prepare a confidential report "offering recommendations to the City" about its personnel policy and procedures manual. ECF No. 52-1 at 1, 7. The core question is whether the attorneys at Saul Ewing, in preparing the confidential report, were actually offering "legal services" to the City or whether they were merely providing business advice to the City.

Plaintiff argues that Saul Ewing was merely providing business advice because (1) the relevant communications were voluntarily made by lower level employees who are not covered

by the City's assertion of the attorney-client privilege and (2) interviewing employees about potential workplace complaints does not constitute a legal service.

Both parties rely on *Upjohn Co. v. United States*, 449 U.S. 383 (1981). There, an audit of a pharmaceutical manufacturing company revealed that a certain foreign subsidiary made payments to foreign government officials in order to secure government business. *Id.* at 386. As a result of this news, the company conducted an internal investigation of what it deemed "questionable payments." *Id.* The investigation included personal interviews and the distribution of questionnaires to Upjohn officers and employees. *Id.* at 387. Managers were instructed to treat the investigation as "highly confidential" and not to discuss it with anyone other than Upjohn employees who might be helpful in providing the requested information. *Id.* After Upjohn's counsel completed the investigative report, the company voluntarily submitted the report to the SEC, which in turn forwarded it to the IRS. The IRS began its own investigation into the matter, and issued a summons to Upjohn demanding production of the written questionnaires and the memoranda and notes of the interviews. *Id.* at 387-88. Upjohn refused to produce the materials, and eventually, the question posed to the Supreme Court was whether these communications between general counsel and lower-level employees at Upjohn were protected by the attorney-client privilege.

The Court began by rejecting the "so-called 'control group test,'" which stated that a privilege only exists if the employee making the communication is in a position to control "a decision about any action which the corporation may take upon the advice of the attorney." *Id.* at 390. The Supreme Court concluded that such a view "overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* "The

first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* The court reasoned that "it is only natural that [lower-level] employees would have the relevant information needed by corporate counsel if he is adequately to advise the client . . . ." *Id.* at 391. The court recognized that "[i]n light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, constantly go to lawyers to find out how to obey the law." *Id.* at 392 (citation and quotation marks omitted). Specifically, in *Upjohn*, "[i]nformation, not available from upper-echelon management, was needed to supply a basis for legal advice concerning compliance with securities and tax laws, foreign laws, currency regulations, duties to shareholders, and potential litigation in each of these areas." *Id.* at 394. Moreover, "the communications were considered 'highly confidential' when made, and have been kept confidential by the company." *Id.* at 395. Ultimately, the Court concluded that "the communications by Upjohn employees to counsel [were] covered by the attorney-client privilege." *Id.* at 397. Any reliance that Plaintiff places on the control group test, or its premise that the privilege does not apply because some of the communications were made with lower-level employees, is thus misplaced.

The Rockville city council, a municipal corporation organized under the laws of Maryland, ECF No. 52-1 at 1, contracted with Saul Ewing so that it could "[r]eview, revise, and supplement the City's Personnel Policy and Procedures Manual." *Id.* at 7. As asserted by Defendants, "the purpose of hiring Saul Ewing was to obtain legal advice regarding the content and sufficiency of the City's personnel policies *vis-à-vis* Federal and State laws and statutes." ECF No. 52 at 13. Such compliance is legally mandated. The State of Maryland has a comprehensive statutory scheme that governs personnel procedures. For example, Title 20 of the

State Government Article governs "Discrimination in Employment," and Titles 5, 6 and 7 of the State Personnel and Pensions Article govern, respectively, "Employee Rights and Protections," the "State Personnel Management System Generally," and "Employment in the State Personnel Management System." According to the City's news release, to accomplish this task, "Saul Ewing established a confidential telephone hotline, which current employees used to schedule confidential in-person meetings to review any complaints or concerns related to the City." ECF No. 52-2 at 2. Moreover, "[f]or the convenience of the witnesses and to protect their privacy, employee interviews were conducted at confidential locations in and around Rockville." *Id.* The final sentence of the news release emphasized that "[t]he final report is confidential as it contains personnel information which cannot be made public." *Id.*

Here, as in *Upjohn*, outside counsel was hired to investigate whether certain of the client's policies and procedures were in accordance with the law. That investigation involved interviews with lower-level employees, that the interviews were not employer-directed, or that a non-lawyer could have conducted the interviews, does not alter the fact that the purpose of the relevant communications was to provide legal advice regarding compliance with employment law. "Courts have consistently recognized that investigation may be an important part of an attorney's legal services to a client." *In re Allen*, 106 F.3d at 602. "While in house accountants or lay investigators could have been employed to investigate the events in question, neither would have brought to bear the same training, skills and background possessed by attorneys and necessary to make the professional independent analysis and legal recommendations sought by the [client]." *Id.* at 602-03. Indeed, "[t]he very retention of outside counsel indicates that the [client] wanted someone who could collect and 'sift [ ] through the facts with an eye to the

legally relevant.'" *Id.* at 602 n.9 (quoting *UpJohn*, 449 U.S. at 390-91). As stated in *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 303 (3d Cir. 1999):

> There may be evidence that the County chose the Webb Law Firm as a "consultant," but the loose use of the term does not alone denude a lawyer of his legal character. . . . It is not uncommon for public entities, including state and local governments, which have appointed attorneys, to engage outside lawyers for advice or for trial in meeting difficult or unusual problems. It is very important in the practice of law, especially matters of great public interest to a county such as a troublesome controversy over an expensive but highly unsatisfactory electronic voting system, that the county have complete freedom of consultation fostered by the client-attorney privilege. The services need not be rendered in conjunction with actual or potential litigation to qualify for the privilege.

### b. Waiver.

Plaintiff also argues that Defendants waived their claimed attorney-client privilege when they issued a news release regarding the findings of the Saul Ewing report. Specifically, Plaintiff maintains that Defendants selectively disclosed certain findings of the report for the tactical purposes of appeasing City employees and deflecting any negative attention the City may have been receiving at the time. ECF No. 51 at 19.

The attorney-client privilege only applies to communications "made with the intention of confidentiality." *Koch v. Specialized Care Servs., Inc.*, 437 F. Supp. 2d 362, 368 (D. Md. 2005). Thus, it is essential that the communications "not be intended for disclosure to third persons." *Id.* "Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982). Moreover, "when a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter." *Id.* However, courts "retain discretion not to impose full waiver as to all communications on the same subject matter where the client has merely disclosed a communication to a third party, as opposed to making some use of it." *Id.*

Here, no actual communications between Rockville employees and Saul Ewing were disclosed to the public. The news release merely outlines the legal services provided to the Rockville city council in response to prior employee complaints. Informing the public that counsel recommended improvements to communication between management and staff does not constitute a disclosure of a confidential communication. "[T]he simple fact that attorney-client communications eventually result in a 'public' communication does not rob the preliminary or prior attorney-client communications of their privileged status." *Koch*, 437 F. Supp. 2d at 369. Adopting the approach suggested by Plaintiff—that the entirety of the Saul Ewing report should be produced on account of the news release—"would lead to the untenable result that any attorney-client communications relating to the preparation of publicly filed legal documents—such as court pleadings—would be unprotected." *Id.* at 370. As concluded in *Koch*, consultative attorney-client communications will not be stripped of their privilege "simply because as a result, a 'public' letter of legal position is subsequently sent." *Id.* "Such a sweeping interpretation would interfere with the noble purposes of the attorney-client privilege to 'encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn*, 449 U.S. at 389). The privilege that protects the communications between Defendants and their counsel that lead to the Saul Ewing Report has not been waived.

### III. Conclusion.

Plaintiff's Motion to Compel Production of the Saul Ewing Report, ECF No. 51, is denied.

Date: October 24, 2014                                                                 /s/
                                                                              JILLYN K. SCHULZE
                                                                              United States Magistrate Judge